**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF IDAHO**

| | | |
|---|---|---|
| **IN RE** | ) | |
| | ) | |
| **STEPHEN JOSEPH LEIPER AND LOREE ANNE LEIPER,** | ) ) | **Case No. 04-02052-TLM** |
| | ) | |
| **Debtors.** | ) | |
| _____ | ) ) | **MEMORANDUM OF DECISION** |
| | ) | |
| **THOMAS E. GENTA & GENTA MANAGEMENT, INC.,** | ) ) ) | |
| **Plaintiffs,** | ) ) | |
| | ) | **Adv. Case No. 04-6193-TLM** |
| **v.** | ) ) | |
| **STEPHEN JOSEPH LEIPER AND LOREE ANNE LEIPER,** | ) ) ) | |
| **Defendants.** | ) ) | |
| _____ | ) | |

**INTRODUCTION**

Plaintiffs Thomas E. Genta ("Genta") and Genta Management, Inc. ("GMI") brought this adversary proceeding against chapter 7 debtors Stephen J. Leiper and LoRee Anne Leiper ("Debtors"). The Court is asked to determine (1) whether Plaintiffs have a secured claim pursuant to §§ 506(a) and 552(b);[1] (2) that

---

[1] Unless otherwise indicated, all chapter and section references are to the unamended Bankruptcy Code, 11 U.S.C. §§ 101-1330, in effect when this case was filed, and prior to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (2005) ("BAPCPA").

MEMORANDUM OF DECISION - 1

Debtors willfully and maliciously converted Plaintiffs' collateral in violation of § 523(a)(6) and, consequently, Plaintiffs' claim is not dischargeable; and (3) that Debtors failed to keep adequate business records thus barring their discharge generally under § 727(a)(3). *See* Adv. Doc. No. 1 at 3.[2]

The action arises out of a sale of a business, as explained in greater detail later in this Decision. However, the Court must note at the outset that all the relevant documents in evidence, discussed further below, are solely in the name of "Genta Management, Inc., an Idaho corporation," of which Genta is the president. Though Genta signed the documents in that capacity, there is absolutely nothing in the evidence that establishes that Genta, personally, has any claim or cause of action against Debtors. Given this failure of proof, a judgment can be summarily entered denying relief to Genta and dismissing his complaint against Debtors.[3] However, given the ultimate outcome of this litigation in favor of Debtors, the

---

[2] The third cause of action is already gone. Debtors' discharge was entered in Case No. 04-02052-TLM on September 9, 2004. When this adversary proceeding first came on for trial on May 19, 2005, the Court concluded that Plaintiffs' errors in completing and filing the required adversary case cover sheet resulted in the discharge being entered notwithstanding the third cause of action set forth in the complaint, and that Plaintiffs' failure to raise any objection or question concerning the discharge once it was entered estopped them from contesting it eight months after the fact. The Court advised that the adversary would proceed on the remaining questions of existence of secured claim and nondischargeability of debt under § 523(a)(6). An oral settlement was thereafter announced on the record. When that settlement could not be consummated, the matter was re-set for trial.

[3] Before a court can consider whether a debt should be excepted from discharge under one of the subdivisions of § 523(a), the plaintiff must prove that the debtor is indebted to it. *Banks v. Gill Distribution Ctrs., Inc. (In re Banks)*, 263 F.3d 862, 868 (9th Cir. 2001) (holding that "there are two distinct issues to consider in the dischargeability analysis: first, the establishment of the debt itself" and, second, the nature of the debt); *see also Purviance v. Region 1 Self Reliance Program (In re Purviance)*, 05.3 I.B.C.R. 68, 70 (Bankr. D. Idaho 2005).

MEMORANDUM OF DECISION - 2

Court will simply refer to "Plaintiffs" in the plural, as the parties have throughout the matter, where such a reference eases reading. In most situations, it will refer to the claims advanced by GMI as Plaintiff.

Trial was held on February 8, 2006.[4] The Court has considered the testimony and other evidence presented, and the arguments of the parties. The Court determines Plaintiffs have failed to establish a right to relief, and judgment shall be entered for Debtors. This Decision constitutes the Court's findings of fact and conclusions of law. Fed. R. Bankr. P. 7052.

**BACKGROUND AND FACTS**

On February 7, 2000, GMI entered into an agreement to sell a business known as Garbonzo's Pizza to Debtors for $50,000.00. *See* Ex. C. This sale contract allocated the purchase price to equipment[5] ($20,000.00), inventory ($500.00), a covenant of seller not to compete ($5,000.00), and goodwill ($24,500.00). *Id.* at 2. The contract further provided that:

> Buyer agrees as security for the deferred balance of the purchase price to provide seller with a UCC-1 financing statement covering all equipment and fixtures being sold and transferred to Buyer, the same to be recorded with the Secretary of State or the Ada County

---

[4] Debtor represented themselves *pro se*. Plaintiffs were represented by counsel.

[5] The equipment list attached to the financing statement and bill of sale listed the following items: (1) Hobart P660 dough mixer bowl, hook, shredder, (2) Garland Air Deck pizza oven, (3) Delfield 66" pizza prep table, (4) Scottsman ice machine, (5) 4-door refrigerator, (6) hood, (7) chest freezer, (8) window air conditioner, (9) 2 Metro shelves, (10) 3 stainless steel tables, (11) a three-compartment sink, (12) hand sink, (13) 6 dining tables, (14) 24 chairs, and (15) miscellaneous small wares. Exs. A, B.

MEMORANDUM OF DECISION - 3

> Recorder. Buyer further agrees not to transfer, sell, or dispose of any equipment or fixtures covered by the UCC-1 financing statement as long as any unpaid installment of the purchase price exists without first securing the written consent of Seller.

*Id.*[6]

Debtors paid $10,000.00 down, leaving a $40,000.00 balance to be paid in 24 monthly installments of $1,872.71. Ex. C at 1-2. Despite the above-quoted language of the sale contract, Debtors contend Plaintiffs orally agreed that once Debtors paid a total of $20,000.00 toward the purchase price, Debtors would own the equipment free and clear of GMI's security interest and that the remaining $30,000.00 of the purchase price obligation would be unsecured. At trial, Genta did not directly or unequivocally contradict the existence of such an agreement, but did indicate it would have been unwise, and that GMI would certainly never have allowed Debtors the right to sell the collateralized equipment while a balance on the sale contract was still owing.

Debtors made monthly payments through September 2000, but then ran into cash flow problems. On September 11, 2000, Debtors and Plaintiffs entered into an addendum that doubled the total number of installments and cut the monthly payment amounts in half to $882.98. Ex. D. Despite the lower

---

[6] Plaintiffs filed the financing statement February 8, 2000, perfecting GMI's interest in the equipment. *See* Ex. A; *see also* Idaho Code § 28-9-310(a).

MEMORANDUM OF DECISION - 4

payments, Debtors still could not keep up.[7]

When Debtors filed a voluntary chapter 13 petition on December 13, 2000,[8] they had paid Plaintiffs at least $20,000.00.[9] Debtors listed most of the equipment as personal property on their 2000 bankruptcy schedules. They also listed "Genta Management, Inc." on their schedules as a creditor holding a disputed $32,000.00 nonpriority unsecured claim. But this listing included no address for the creditor. Case No. 00-03156-TLM at Doc. No. 1, schedule F.[10]

Debtors' chapter 13 plan ran into numerous problems. *See* Case No. 00-03156-TLM at Doc. Nos. 12, 15, 17. Unable to confirm a plan, Debtors converted to chapter 7 on April 5, 2001. *Id*. at Doc. No. 18. But Debtors failed to appear at the post-conversion meeting of creditors, and the case was dismissed May 23, 2001. *Id*. at Doc. Nos. 21, 23, 24.

---

[7] The sale included GMI's assignment of its rights as tenant under a real property lease with ESCO, Inc. *See* Ex. F at internal Ex. 2. Debtors claim that Plaintiffs' failures in dealing with the business premises' lessor, ESCO, resulted in Debtors' inability to perform the agreement and the shuttering of the business. The Court need not resolve this contention.

[8] *See* Case No. 00-03156-TLM. The Court takes judicial notice of its files and records in that case as well as in Case No. 04-02052-TLM. Fed. R. Evid. 201.

[9] Mr. Leiper testified he had made around $24,000.00 in payments, though Debtors' answer to Plaintiffs' complaint states a total of $21,775.69 in payments were made. *See* Adv. Doc No. 2 at 4. Genta testified he had received something closer to $20,000.00.

[10] Since schedule F has no address for GMI, it might be assumed that the mailing matrix, required under Fed. R. Bankr. P. 1007(a) and Local Bankruptcy Rule 1007.1, did not have one either. But the matrix is not among the electronically imaged documents readily available to the Court. In lieu of retrieving the file in this case from archives, and given the tangential nature of this issue, the Court relies on the later BNC notice of dismissal of the case, which is in the electronic record. According to the BNC certificate of service on the dismissal, Genta Management, Inc. was listed as a "Bypassed Recipient" reflecting that no address was provided on the matrix. *See* Case No. 00-03156-TLM at Doc. No. 24.

MEMORANDUM OF DECISION - 5

Sometime in late 2000 or early 2001, Debtors sold the pizza business equipment, admittedly without Plaintiffs' consent, for something less than $3,000.00.[11]

Plaintiffs never filed a claim in Debtors' 2000 bankruptcy case (though, as noted, it is not clear Plaintiffs were ever advised of that bankruptcy). But GMI did file a lawsuit in Canyon County against Debtors on February 26, 2001, based on the default on the sale contract.[12]  *See* Ex. F.  Oddly, no mention is made of the equipment in the complaint as, for example, in a count for claim and delivery of the collateral.  Furthermore, there is no evidence GMI ever attempted to repossess the equipment under UCC Article 9 prior to or after the lawsuit.  GMI received a default judgment January 4, 2002.  Ex. G.

---

[11] Mr. Leiper could not remember at trial exactly when he sold the equipment, or to whom.  He said he thought he sold it between September 2000 and April 2001.  Given the fact that Debtor listed the bulk of the equipment as personal property on his 2000 bankruptcy petition, he likely sold it sometime after December 13, 2000.  And, in Debtors' answer to Plaintiffs' complaint in this adversary proceeding, they state the equipment was sold for $2,850.00 to "a Mr. Jacobsen."  *See* Adv. Doc. No. 2 at 5.

[12] The circumstances surrounding GMI's state court lawsuit raise several interesting issues.  For example, the filing of the lawsuit appears to have violated the § 362(a) stay in Case No. 00-03156-TLM and, accordingly, the judgment would be void.  *Schwartz v. United States (In re Schwartz)*, 954 F.2d 569, 571 (9th Cir. 1992).  As noted, it appears the mailing matrix of Debtors in that case never set out a mailing address for GMI.  Therefore, it appears GMI may never have received notice of Debtors' bankruptcy.  While lack of notice would not alter the void nature of the judgment, it likely protects Plaintiffs from any § 362(h) consequences.  In addition to these issues, Mr. Leiper claims he was never served with the state court lawsuit, and much testimony was offered concerning the asserted proof of service and its effectiveness.  Another set of issues surround the misspelling of the Leipers' name on the state court complaint and summons as "Leaper" and yet another set of issues flow from the fact the lawsuit was filed in Canyon County though Debtors resided in Ada County, thus raising questions under Idaho Code § 5-404 ("[T]he action must be tried in the county in which the defendants. . . reside, at the commencement of the action[.]").  Fortunately, the Court finds it possible to resolve the causes of action presented in this adversary proceeding without reaching these several issues.

MEMORANDUM OF DECISION - 6

Debtors filed another bankruptcy petition June 8, 2004, commencing the instant chapter 7 case. Debtors listed "Genta Mgmt., Inc." on schedule F as a disputed creditor with a $46,139.50 nonpriority unsecured claim, and provided notice of the filing in care of GMI's state court counsel. Plaintiffs indicate they discovered Debtors had sold the equipment at the § 341(a) creditors' meeting held in July, 2004.

**DISCUSSION AND DISPOSITION**

    **A.    Does GMI have a secured claim under § 506(a)?**

A "claim" is broadly defined by the Code to include virtually any "right to payment," including certain equitable remedies. *See* § 101(5).[13] A "security interest' is a consensual secured claim created by agreement between the debtor and the creditor.[14] *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 240 (1989). A bankruptcy "estate" is created upon the commencement of a case, and includes all "legal or equitable interests of the debtor" and "all interests of the

---

[13] Section 101(5) states:

The term "claim" means -

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, secured, or unsecured.

[14] Section 101(51) states:

The term "security interest" means lien created by an agreement.

MEMORANDUM OF DECISION - 7

debtor and the debtor's spouse in community property." *See* § 541(a)(1), (2).

Section 506(a)(1) provides that a creditor's claim is deemed an allowed secured claim "to the extent of the value of such creditor's interest in *the estate's interest* in such property[.]" (emphasis added). The balance of the creditor's claim that is not an allowed secured claim is an unsecured claim. § 506(a)(1); *In re Stallings*, 290 B.R. 777, 784, 03.1 I.B.C.R. 77, 80 (Bankr. D. Idaho 2003).

In this case, the equipment collateral was sold in late 2000 or early 2001. Accordingly, it is awfully difficult to see how Debtors' bankruptcy estate has an interest in the equipment at the date of filing in June, 2004. As stated in 4 Collier on Bankruptcy ¶ 506.05[5][a] at 506-34 (Alan N. Resnick & Henry J. Sommer, eds. Rev. 15th ed. 2005):

> If . . . the collateral was transferred by the debtor prior to the commencement of the bankruptcy case, and the debtor retained no interest in the property or the transfer cannot be set aside, the estate will have no interest in the collateral and, hence, the creditor's interest in the estate's interest in the collateral will be nothing (even though the creditor's interest may continue in the property itself, albeit in someone else's hands).

*Id.* (citations omitted). Since a creditor's secured claim is dependent on and measured by the estate's interest in such property, GMI does not have a secured claim as to the equipment in this case. GMI has made no cogent argument to the contrary. Nor has GMI indicated any other collateral exists to secure its claim as of the petition date.

It is true that, under Idaho law, once a security interest has attached to

MEMORANDUM OF DECISION - 8

collateral, the secured party has rights to any "identifiable" proceeds of the sale of the collateral. *See* Idaho Code §§ 28-9-203(f); 28-9-315(a)(1), (2). Accordingly, GMI's security interest would have attached to the $2,850.00 cash proceeds of the equipment sale in late 2000 or early 2001. Idaho Code § 28-9-315(a)(2). However, based on the record before the Court and the testimony of the parties, those proceeds have long since ceased to be "identifiable."

Therefore, GMI has not established the existence of a secured claim under § 506(a) as alleged in their complaint.

### B. Does GMI have a secured claim under § 552(b)?

GMI also urges the Court to determine it has a secured claim pursuant to § 552(b).[15] However, that provision indicates only that a security interest created by a security agreement prior to the commencement of the case will "extend to proceeds. . . acquired by the estate *after the commencement of the case* to the extent provided by such security agreement and. . . applicable nonbankruptcy law." Section 552(b)(1) (emphasis added). Debtors sold the equipment prior to

---

[15] Section 552(b) states:

(1) Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, or profits of such property, then such security interest extends to proceeds, product, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

MEMORANDUM OF DECISION - 9

filing the instant bankruptcy petition, and the estate did not acquire any property or proceeds post-petition. Simply put, § 552(b)(1) is not applicable, and GMI has not shown that it has a secured claim under this section, just as it failed to show a secured claim under § 506(a), *supra*.

### C. Is GMI's claim excepted from discharge under § 523(a)(6)?

GMI asks the Court to declare its claim nondischargeable pursuant to § 523(a)(6),[16] claiming Debtors willfully and maliciously converted its collateral.

A creditor bringing a § 523(a)(6) action must prove all requisite elements for nondischargeability by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991); *Spokane Ry. Credit Union v. Endicott (In re Endicott)*, 254 B.R. 471, 475, 00.4 I.B.C.R. 199, 200 (Bankr. D. Idaho 2000). In order to effectuate the policies underlying the Code, objections to discharge are strictly construed against creditors and liberally in favor of debtors. *Palmer v. Downey (In re Downey)*, 242 B.R. 5, 12, 99.4 I.B.C.R. 165, 168 (Bankr. D. Idaho 1999); *McVay & Corrigan, A.P.C. v. Barnetche (In re Barnetche)*, 98.2 I.B.C.R. 37 (Bankr. D. Idaho 1998).

The Court in *Dominguez v. Elias (In re Elias)*, 302 B.R. 900, 03.4 I.B.C.R. 243 (Bankr. D. Idaho 2003) set out the relevant burdens faced by a creditor

---

[16] Section 523(a)(6) states:

A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt– (6) for willful and malicious injury by the debtor to another entity or to the property of another entity[.]

MEMORANDUM OF DECISION - 10

alleging a § 523(a)(6) cause:

> To satisfy the willfulness prong, the creditor must prove that the debtor deliberately or intentionally injured the creditor, and that in doing so, the debtor intended the consequences of his act, not just the act itself. *See Kawaauhau v. Geiger*, 523 U.S. 57, 61-62 (1998). Elaborating on the debtor's state of mind required by this statute, the Ninth Circuit has explained that a debtor must possess a subjective motive to inflict injury, or believe that injury is substantially certain to result from his conduct. [*Carrillo v. Su (In re Su)*, 290 F.3d 1140, 1145-46 (9th Cir. 2002)]. Thus, a creditor cannot prevail in an action brought under § 523(a)(6) unless it is shown that the debtor had actual knowledge that harm to the creditor was substantially certain to occur from the debtor's acts. *Id*. at 1145-46. However, actual knowledge may be shown through circumstantial evidence of "what the debtor must have actually known when taking the injury-producing action. . ." *Id*. at 1146 n.6. To satisfy the malicious prong, the creditor must prove that the debtor's conduct involved: (1) a wrongful act; (2) done intentionally; (3) which necessarily causes injury; and (4) is done without just cause and excuse. *Id*. at 1146-47.

302 B.R. at 907.

Although this Court issued its decision in *Endicott* prior to *Elias* and *Su*, its articulation of the standard for proving a § 523(a)(6) claim is consistent with those later cases. And *Endicott* directly addressed such a claim advanced on the basis of an alleged conversion:

> [A] creditor must show that a debtor, when converting collateral, did so with the specific intent of depriving the creditor of its collateral or did so knowing, with substantial certainty, that the creditor would be harmed by the conversion. This subjective test focuses on whether the injury was in fact anticipated by the debtor and thus insulates the innocent collateral conversions from non-dischargeability under § 523(a)(6).

*Endicott*, 254 B.R. at 478. Or, as stated from the debtor's point of view:

MEMORANDUM OF DECISION - 11

> Essentially, for a conversion to be dischargeable it must be done innocently in the honest but mistaken belief that authority to sell or use the collateral exists ("technical" conversion).

*Thiara v. Spycher Bros. (In re Thiara)*, 285 B.R. 420, 430 (9th Cir. BAP 2002) (citing *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 332 (1934)).

Deciding whether a debtor has engaged in an "innocent collateral conversion" must be done on a case-by-case basis. *Endicott*, 254 B.R. at 478 (citing *AVCO Financial Servs. v. Kidd (In re Kidd)*, 219 B.R. 278, 284 (Bankr. D. Mont. 1998)).

*Endicott* involved debtors who bought a boat and trailer in which the plaintiff retained a security interest. The debtors defaulted and attempted to surrender the collateral. The plaintiff refused to take it saying, due to a paperwork error, the loan was unsecured. Based on this assertion and related comments, the debtors sold the collateral, realizing less than half the original purchase price. The Court found the debt owed plaintiff dischargeable because:

> The Defendants had a basis upon which to believe that Plaintiff, through its own review of the documents and its own informed and conscious decision, had elected to forgo the collateral and pursue the debt. The actions of plaintiff in responding to the Defendants' entreaties to surrender the boat and trailer were unlike the conduct of several other secured creditors, all of whom accepted tender of collateral or repossessed their collateral. Even if Plaintiff's employee used the term "unperfected" rather than "unsecured" when talking with the Defendants, the tenor of the communications between the parties. . . supports the Defendant's conclusion, though mistaken, that normal impediments to liquidation or property standing as collateral for a debt had been removed.

MEMORANDUM OF DECISION - 12

*Endicott*, 254 B.R. at 479-80.

*Endicott* relied, in part, on the analysis set forth in *E. Idaho Fed. Credit Union v. Thomason (In re Thomason)*, 225 B.R. 751, 98.3 I.B.C.R. 77 (Bankr. D. Idaho 1998). That case involved a lender that mistakenly took its lien off the title to the debtor's truck before the loan was paid off. The debtor subsequently disposed of the truck, thinking it was now free of plaintiff's security interest. The Court ruled the debt dischargeable:

> Based upon [the debtor's] past experiences in purchasing vehicles and in his relationship with Plaintiff, the Court finds Defendant genuinely believed that Plaintiff had released its lien. He did not dispose of the truck with the intent to injure Plaintiff; he traded in the pickup because he thought, mistakenly as it turns out, that he was free to do so. Prudence should have dictated that Defendant inquire with Plaintiff about his receipt of the title under these circumstances. His failure to do so, while perhaps negligent, does not rise to the level of intentional misconduct.

*Id*. at 753. *See also Peklar v. Ikerd (In re Peklar)*, 260 F.3d 1035 (9th Cir. 2001) (finding debt arising from a "negligent" or "technical" conversion dischargeable, where debtor relied on advice of attorney to remove property from leased space.).

*Endicott*, *Kidd*, *Thomason, Thiara* and *Peklar* all support the basic premise that intent matters. Given *Geiger*'s articulation of the § 523(a)(6) standard and focus on intent to cause injury, this is not surprising. In short, if the conversion of collateral is done through mistake or negligence, even unreasonably or recklessly, the resultant liability to the secured creditor is dischargeable under § 523(a)(6)

MEMORANDUM OF DECISION - 13

because the requisite wrongful intent is lacking.[17]

### 1. Were Debtors' actions here "willful and malicious"?

*Su* instructs that all evidence indicating the nature of the debtor's subjective intent to injure should be closely examined. *Endicott* and *Thomason* also note the need for the court to consider direct and circumstantial evidence regarding the debtor's conduct and, particularly, his or her intent. Additionally, a plaintiff's actions or inactions may be relevant in determining whether the plaintiff contributed to the debtor's "honest, but mistaken" belief that disposition of secured collateral was authorized. *Endicott*, 254 B.R. at 479-80; *Thomason*, 225 B.R. at 753.

There was no preponderating proof of an oral agreement, contravening the express language of the sale contract, that would terminate GMI's security interest in the equipment once Debtors made payments totaling $20,000.00. But the existence or enforceability of such an agreement is not key; Debtors' intent is. The evidence on that intent is conflicting.

Mr. Leiper admits to reading and reviewing the sale and security documents, and he acknowledges that they contain no such provision. Still, he

---

[17] The Court acknowledges that *Harry Ritchie's Jeweler's, Inc. v. Chlebowski (In re Chlebowski)*, 246 B.R. 639 (Bankr. D. Or. 2000) came to an opposite result. The Court obviously is not bound by a sister court's decision, and it further concludes that *Chlebowski* is not persuasive when applied to the facts of the instant case. In short, in the area of conversions under § 523(a)(6), the facts are vitally important, and the trial court must evaluate all evidence that might arguably relate to the intent of the debtor when acting in violation of a security agreement.

MEMORANDUM OF DECISION - 14

was adamant that the "side deal" existed. There was no effective examination establishing that his professed belief was false or manufactured. Plaintiffs' reliance on the terms of the written agreement may well be sufficient if the contest were over the enforcement of the alleged oral agreement. However, that reliance on contract language does not carry as much weight when evaluating testimonial credibility.

Once Debtors hit the $20,000.00 mark, there is no evidence that Debtors demanded release of the UCC financing statement or proof the lien was extinguished. Debtors have not explained why, if the oral agreement existed, they did not pursue clarification at this juncture.

On the other hand, once default of the payment obligations occurred, it does not appear that Plaintiffs ever attempted to repossess the equipment. Even the later state court lawsuit concerned only Debtors' default on the sale contract and related lease agreement, and it did not mention the equipment or seek to enforce the security agreement. *See* Ex. F.[18] GMI's failure to attempt to repossess the equipment or otherwise enforce the security interest does not necessarily prove that Debtors' assertion regarding the agreed release of that collateral is correct. But it does add support to the idea that Debtors had an honest, though mistaken, belief as to their right to sell the collateral once they had paid $20,000.00.

---

[18] When GMI filed its state court lawsuit, it did not know the equipment had been sold. Mr. Genta testified he found out for the first time about the equipment sale at the meeting of creditors in the 2004 bankruptcy case.

MEMORANDUM OF DECISION - 15

That Debtors scheduled GMI's claim as unsecured in their 2000 filing, while at the same time listing the equipment on schedule B, is consistent with their testimony as to the understanding of the parties. While a mutual understanding was lacking, the scheduling in this fashion does corroborate the testimony as to Debtors' intent.[19]

The Court has considered carefully the question of Mr. Leiper's credibility. He is a man of somewhat selective memory. For example, although he remembers the alleged oral agreement with Plaintiffs quite clearly, he does not remember who he sold the equipment to, or when.

In addition, he seems to have assigned no less than five different valuations to the equipment. The sale contract gives it an agreed value of $20,000.00. Ex. C at 2. Mr. Leiper valued the same equipment at over $57,000.00 in a loan application with Farmers & Merchants State Bank.[20] In his 2000 bankruptcy, he listed the value of the equipment at nearly $26,000.00. *See* Case No. 00-03156-TLM, Doc. No. 1. He ultimately sold the equipment for $2,850.00. Adv. Doc. No. 2 at 5. Finally, at trial, Mr. Leiper estimated the equipment, at the time he bought it from Plaintiffs, was worth $14,500.00. Inconsistency on material facts

---

[19] Debtors scheduling Plaintiffs as unsecured in their 2004 filing has no similar implication as to Debtors' understanding or intent, as the equipment was long gone by then.

[20] A copy of a financing statement for the bank was marked as Exhibit "H" but was not offered. *See* Adv. Doc. No. 28. However, Mr. Leiper's testimony at trial is consistent with the valuation given on the loan documents.

MEMORANDUM OF DECISION - 16

does not bolster credibility.

While Mr. Leiper's credibility is certainly not without problem, the Court's careful consideration of all testimony and witness demeanor leads it to conclude that Mr. Leiper held an honest, though legally and factually erroneous, belief that he was authorized to sell the equipment having had paid at least $20,000.00 to GMI under the sale contract. This negates the level and quality of intent to cause injury that is required under *Geiger* and its progeny. However imprudent, naive, negligent or perhaps even reckless Debtors' actions may have been, Plaintiffs have not proven by a preponderance of the evidence that Debtors willfully and maliciously converted GMI's equipment.[21]

## CONCLUSION

Plaintiffs have failed to establish the existence of a secured claim under either § 506(a) or § 552(b). Plaintiffs have also failed to show by a preponderance of the evidence that Debtors willfully and maliciously converted the subject equipment to their own use under § 523(a)(6). Judgment will be entered for Debtors, discharging Plaintiffs' unsecured claims.

---

[21] This Decision's text has concerned Mr. Leiper, and nothing has been said of LoRee Anne Leiper. Plaintiffs were required to prove their § 523(a) cause of action separately as to Mrs. Leiper. *Tsurukawa v. Nikon Precision, Inc., (In re Tsurukawa)*, 258 B.R. 192, 198 (9th Cir. B.A.P. 2001); *In re Covino*, 04.3 I.B.C.R. 98, 105 (Bankr. D. Idaho 2004). They presented no evidence in regard to her conduct or intent. Regardless of the resolution of the issues addressed in this Decision as to Mr. Leiper, judgment would have to be entered for Mrs. Leiper based on Plaintiffs' failure to prove a prima facie case as to her.

MEMORANDUM OF DECISION - 17

DATED: February 24, 2006



*Terry Myers* (signature)

TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

CERTIFICATE RE: SERVICE

    A "notice of entry" of this Decision, Order and/or Judgment has been served on Registered Participants as reflected by the Notice of Electronic Filing. A copy of the Decision, Order and/or Judgment has also been provided to non-registered participants by first class mail addressed to:

Steven Joseph Leiper &
LoRee Anne Leiper
4900 N Paynton Way
Boise, ID  83703

Case No. 04-06193-TLM

Dated:  February 24, 2006

   /s/
Suzanne Hickok
Law Clerk to Chief Judge Myers

MEMORANDUM OF DECISION - 19